UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **ALYSSA TURNER**, individually and for others similarly situated,<br><br>            Plaintiff,<br><br>     v.<br><br>**IEM INTERNATIONAL, INC.**, f/k/a INNOVATIVE EMERGENCY MANAGEMENT, INC.<br><br>            Defendant. | Case No. 24-cv-2352 (CRC) |

## MEMORANDUM OPINION

Plaintiff Alyssa Turner filed this class action against her former employer IEM International, Inc. ("IEM") seeking to recover unpaid overtime wages. Before she began work at IEM, however, Turner electronically signed an employee agreement permitting the company to resolve any claim arising from her employment through binding arbitration. Turner now claims she never signed that agreement. Because her unsupported assertion is not sufficient to raise a dispute of material fact as to whether she signed the agreement, and she cannot show that the arbitration provision in the agreement is unconscionable, the Court will grant IEM's motion to compel arbitration.

**I.    Background**

IEM is an emergency-management firm headquartered in North Carolina. Declaration of Alyssa Turner ("Turner Decl.") at ¶ 6. Turner served as a planner and project manager at IEM for approximately two years beginning in September 2021. Id. ¶ 4. She worked in California, Washington, District of Columbia, and Virginia. Id. ¶ 5. On September 13, 2021, Turner electronically counter-signed an employment offer letter she received from IEM. Id. ¶ 6; see id.,

Ex. 1 ("Offer Letter"). The letter offered her a position as a Medical Logistics Coordinator with a starting hourly rate of $41.50. Offer Letter at 1.

The parties dispute what happened next. IEM asserts that two days later, on September 15, Turner signed an employee agreement including a mandatory arbitration provision. Mot. to Compel Arbitration at 1; see id., Ex. A ("Employee Agmt."). The agreement requires an employee to give notice of any claim "relating to or arising out of Employee's hire, employment, and/or termination of employment with IEM." Employee Agmt. at 1–2. If such a claim cannot be settled through negotiation or nonbinding mediation, "either party may submit the dispute for resolution by final binding confidential arbitration." Id. at 2. The arbitration decision is not appealable unless the arbitrator engages in fraud or gross misconduct. Id. IEM bears the arbitrator's fees and expenses, while each party's other costs, including attorneys' fees, "shall be borne by the party incurring the expense." Id. at 3. The last page of this agreement appears to be an electronic signature page indicating that a user named "Alyssa Crawford," with a User ID of ACrawford@IEMI, signed the agreement on September 15, 2021 at 9:36 A.M. EDT. Id. at 5 (page number designated by CM/ECF).

According to IEM's Director of Human Resources, Amy Stewart, IEM provides this agreement to new hires as part of the onboarding process and retains each employee's signed agreement in their personnel file. Declaration of Amy Stewart ("Stewart Decl.") at ¶ 4. Each employee is allowed as much time as they need to review and complete the agreement. Id. ¶ 7. In September 2021, when Turner began working for IEM, newly hired employees were required to complete onboarding prior to their first day of work. Id. ¶ 8. Each employee received a unique username to log into the Automatic Data Processing ("ADP") Workforce system. Id. Once they logged in for the first time, employees were prompted to create their own password to

log in on future occasions, to which only they had access.  Id.  The ADP system was also protected by multi-factor authentication.  Id.

Turner's personnel records, according to Stewart, indicate that she signed the employee agreement.  Id. at  ¶ 11.  IEM's electronic records also reflect that the system registered a transaction associated with Turner's account on September 15, 2021 at 9:36 A.M. EDT.  Id. ¶ 12.  That account could only be accessed using Turner's unique password.  Id.  Based on Stewart's review of Turner's electronic signature page, "it is reasonable to believe that [Turner] electronically signed the Agreement."  Id. ¶ 13.

Turner, on the other hand, declares that she never signed the employee agreement.  Turner Decl. ¶ 7.  She acknowledges signing her offer letter, but claims this was the only agreement she signed with IEM.  Id. ¶ 6.  She also says she had never seen the employee agreement until her lawyers provided it to her after she filed this lawsuit.  Id. ¶ 7.  She adds that she cannot afford arbitration under the agreement's terms.  Turner Decl. ¶ 8.

In August 2024, Turner filed this class-action suit against IEM to recover unpaid overtime wages.  Compl. ¶ 1.  Specifically, she alleged that IEM's policy of paying so-called "Straight Time Employees" the same hourly rate for overtime hours violates the Fair Labor Standards Act, as well as California and D.C. law.  Id.  ¶ 10.  IEM responded with a motion to compel arbitration, which Turner opposed.  For the reasons that follow, the Court will grant IEM's motion.

## II.   Legal Standards

The Federal Arbitration Act ("FAA") provides that a provision in a contract requiring the arbitration of disputes related to the contract "shall be valid."  9 U.S.C. § 2.  The D.C. Circuit has held that "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration[.]"

Wolff v. Westwood Mgmt., LLC, 558 F.3d 517, 520 (D.C. Cir. 2009) (quoting Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp., 460 U.S. 1, 24–25 (1983)).  Notwithstanding a prior agreement to arbitrate, plaintiffs often attempt to resolve disputes in federal court.  Section Four of the FAA provides a remedy for the defendant:  "A party aggrieved by the alleged failure, neglect, or refusal of another to arbitrate under a written agreement for arbitration may petition any United States district court . . . for an order directing that such arbitration proceed in the manner provided for in such agreement."  9 U.S.C. § 4.

Such a petition is often called a motion to compel arbitration and is properly resolved under the summary judgment standard.  Aliron Int'l, Inc. v. Cherokee Nation Indus., Inc., 531 F.3d 863, 865 (D.C. Cir. 2008).  The Court may consider evidence outside the complaint and shall grant the motion if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  In making this determination, the Court shall view the facts "in the light most favorable to the nonmoving party."  Chambers v. U.S. Dep't of Interior, 568 F.3d 998, 1000 (D.C. Cir. 2009).

**III. Analysis**

A. A Valid Agreement to Arbitrate Exists Between the Parties

Turner first disputes that any valid agreement to arbitrate exists between her and IEM.  Although IEM offers an employee agreement mandating arbitration that appears to bear Turner's electronic signature, she denies ever signing it.  Turner Decl. ¶ 7.

For this threshold question, the parties agree that D.C. law applies even though the arbitration agreement includes a North Carolina choice-of-law provision.[1]  See Opp'n at 8

---

[1] With good reason.  "Applying [a contract's] choice-of-law clause to resolve the contract formation issue would presume the applicability of a provision before its adoption by the parties

4

(noting that Turner does not object to the application of D.C. law); Reply at 6–10 (citing D.C. cases). Under D.C. law, "[m]utual assent to a contract, often referred to as a 'meeting of the minds,' is most clearly evidenced by the terms of a signed written agreement[.]" Davis v. Winfield, 664 A.2d 836, 838 (D.C. 1995). And a "signature, contract, or other record relating to such transaction may not be denied legal effect . . . solely because an electronic signature or electronic record was used in its formation." Apprio, Inc. v. Zaccari, 104 F.4th 897, 907 (D.C. Cir. 2024) (alteration in original) (quoting E-Sign Act, 15 U.S.C. § 7001(a)).

Here, IEM offers an employee agreement permitting either party to submit any claim arising out of an individual's employment with IEM to binding arbitration. Employee Agmt. at 1, 2. The agreement includes an electronic signature page showing that "Alyssa Crawford," username "ACrawford@IEMI," signed the agreement on September 15, 2021 at 9:36 A.M. EDT.[2] Employee Agmt at 5 (page number designated by CM/ECF). Ms. Stewart, IEM's Human Resources Director, further attests that based on her review of personnel records, Turner signed and acknowledged a variety of documents during onboarding, including this employee agreement. Stewart Decl. ¶ 11. Stewart also avers that on September 15 at 9:36 A.M.—the date and time listed on the electronic signature page—Turner was logged into her ADP Workforce account "using a unique password that" only she could create and access. Id. ¶ 12.

---

has been established." CD Int'l Enters., Inc. v. Rockwell Cap. Partners, Inc., 251 F. Supp. 3d 39, 43 n.2 (D.D.C. 2017) (Cooper, J.) (alteration in original) (citation omitted).

[2] Since 2021, Turner appears to have changed her name from Crawford. She does not dispute that her last name was Crawford in 2021, and the offer letter she acknowledges signing likewise displays the electronic signature of Alyssa Crawford. Opp'n, Ex. 1-1 ("Offer of Employment"), at 5 (page number designated by CM/ECF).

5

In the face of this strong evidence, Turner asserts without any support that she "did not sign" the employee agreement, nor had she seen it before her lawyers provided it to her after this case was filed. Turner Decl. ¶ 7. She also claims that she does not have a copy of this agreement in her emails or her ADP account. Id. Turner offers no additional facts supporting this bare assertion, nor does she explain how IEM came to have her electronic signature page. She merely speculates, without foundation, that her signature page could have been "attached by anyone with a scanner or Adobe Acrobat," perhaps intending to suggest that her signature page was fabricated. Opp'n at 11.

But as in Mitchell v. Craftworks Restaurants & Breweries, Inc., No. 18-cv-879 (RC), 2018 WL 5297815 (D.D.C. Oct. 25, 2018), Turner's statement that she has "no recollection of signing, reading, or negotiating" the agreement does not "create a genuine dispute regarding her assent" to it. Id. at *7. And though, unlike in Mitchell, Turner outright denies having signed the agreement, that denial alone does not create a dispute of fact because she has not shown "sufficient facts in support" of her statement. Id. Her "mere assertion . . . with no evidence supporting the disavowal—is insufficient to create an issue of fact in light of" the signed agreement to arbitrate and Stewart's supporting declaration. Hill v. Wackenhut Servs. Int'l, 865 F. Supp. 2d 84, 91 (D.D.C. 2012).

Moreover, Turner's reliance on her offer letter dated two days earlier furthers IEM's position, not hers. Turner acknowledges electronically signing the offer letter sent to her by IEM on September 13. Turner Decl. ¶ 6; see Offer of Employment. Her electronic signature page is nearly identical to the signature page accompanying her employee agreement, except that it includes her email rather than her ADP username—which she presumably had not yet created.

6

See Stewart Decl. ¶ 8. That lends even less credence to her assertion that she did not sign the employee agreement in exactly the same manner.

Turner also emphasizes that her offer of employment "constitute[d] the full and complete offer from IEM" such that "[a]ny other agreements, verbal or otherwise, that are not contained within this letter are null and void." Offer of Employment at 4. But Turner's offer letter predates her agreement to arbitrate, so any argument that her offer letter somehow invalidated the subsequent employee agreement misses the mark.

Lastly, Turner likens the arbitration agreement to a "sign-in-wrap" agreement that must be analyzed by reference to several factors to determine whether a party knowingly assented to its terms. Opp'n at 10. This analogy is misplaced. "'Sign-in-wrap' agreements are those in which a user signs up to use an internet product or service, and the signup screen states that acceptance of a separate agreement is required before the user can access the service." Selden v. Airbnb, Inc., No. 16-cv-933 (CRC), 2016 WL 6476934, at *4 (D.D.C. Nov. 1, 2016) (Cooper, J.), aff'd, 4 F.4th 148 (D.C. Cir. 2021). Turner signed the arbitration agreement after individually accessing it so she could begin her employment with IEM. Stewart Decl. ¶¶ 8, 12. She did not click a box to subscribe to an internet service.

Accordingly, the Court concludes that a valid agreement to arbitrate exists between IEM and Turner.

B. The Agreement is Not Unconscionable

Turner next argues that, even if she signed the employment agreement, the arbitration clause is substantively and procedurally unconscionable. The Court first considers what law applies to its analysis by looking "to the District of Columbia for the applicable choice of law principles." Ekstrom v. Value Health, Inc., 68 F.3d 1391, 1394 (D.C. Cir. 1995) (quoting Gray

v. Am. Express Co., 743 F.2d 10, 16 (D.C. Cir. 1984)).  Turner's employee agreement includes a choice-of-law provision mandating that disputes or controversies arising out of the agreement shall be governed by North Carolina law.  Employee Agmt. at 3.  And the D.C. Court of Appeals has adopted the general rule "that parties to a contract may specify the law they wish to govern, as part of their freedom to contract, as long as there is some reasonable relationship with the state specified."  Ekstrom, 68 F.3d at 1394 (quoting Norris v. Norris, 419 A.2d 982, 984 (D.C. 1980)).  IEM is headquartered in North Carolina, so it has a "reasonable relationship" to that state.  See Whiting v. AARP, 637 F.3d 355, 361 (D.C. Cir. 2011).  Accordingly, North Carolina law governs the Court's analysis of whether this agreement is unconscionable.

"A court will find a contract to be unconscionable only when the inequality of the bargain is so manifest as to shock the judgment of a person of common sense, and where the terms are so oppressive that no reasonable person would make them on the one hand, and no honest and fair person would accept them on the other."  Tillman v. Com. Credit Loans, Inc., 655 S.E.2d 352, 369 (N.C. 2008) (quoting Brenner v. Little Red Sch. House, Ltd., 274 S.E.2d 206, 210 (N.C. 1981)).  To establish unconscionability pursuant to North Carolina law, "a party must demonstrate both procedural unconscionability and substantive unconscionability."  Mercadante v. XE Servs., LLC, 78 F. Supp. 3d 131, 143 (D.D.C. 2015) (quoting Torrence v. Nationwide Budget Fin., 753 S.E.2d 802, 807 (N.C. Ct. App. 2014)).  Here, Turner has demonstrated neither.

  1. *Substantive Unconscionability*

Substantive unconscionability "refers to harsh, one-sided, and oppressive contract terms." Tillman, 655 S.E.2d at 370 (citing Rite Color Chem. Co. v. Velvet Textile Co., 411 S.E.2d 645, 648–49 (N.C. Ct. App. 1992)).  Turner contends that the agreement she signed is substantively unconscionable because it "makes arbitration a recipe for financial ruin" by requiring each party

8

to pay their own attorneys' fees, notwithstanding statutory fee-shifting provisions. Opp'n at 13–14. The agreement requires IEM to pay the arbitrator's fees, but all other expenses, including each party's attorneys' fees, "shall be borne by the party incurring the expense." Employee Agmt. at 3. Another judge in this district applied North Carolina law to reject a fee-shifting provision as a basis for substantive unconscionability. See Mercadante, 78 F. Supp. 3d at 144. This Court will do the same.

As explained in Mercadante, "the shifting of attorneys' fees and expenses from Defendants to Plaintiffs" is "precisely the sort of provision that the North Carolina Court of Appeals determined could not support an unconscionability claim." Id. (citing Torrence, 753 S.E.2d at 807). Indeed, that court "specifically concluded that high arbitration costs . . . could no longer be a basis for substantive unconscionability" following the Supreme Court's decisions in AT&T Mobility LLC v. Concepcion, 563 U.S. 333 (2011) and American Express Co. v. Italian Colors Restaurant, 570 U.S. 228 (2013). Id.[3] The North Carolina Court of Appeals viewed such a challenge as one "directed at the arbitration process itself," which is not a basis for unconscionability. Id. (citing Torrence, 753 S.E.2d at 811). Here too, "[t]he shifting of arbitration costs to" to Turner "does not constitute substantive unconscionability." Id.

Turner next contends that the arbitration agreement is unconscionable because IEM retains the right to file a lawsuit to enforce its rights, while she does not. See Employee Agmt. at

---

[3] Turner also protests that as a practical matter, she simply cannot afford the cost of arbitrating this case. Turner Decl. ¶¶ 12–13. Thus, she says, the arbitration agreement will prevent her from effectively vindicating her statutory rights. Opp'n at 20–22. IEM, however, represents that it is willing and able to "cover the full cost of arbitration" and to abide by "the fee-shifting provisions of any statute at issue in this matter," which should give Turner some comfort. Reply at 12 n.5. In any event, under North Carolina law, "prohibitively high" potential arbitration costs no longer factor into unconscionability analysis. See Torrence, 753 S.E.2d at 811–12.

9

3 ("Nothing herein shall be construed to prevent IEM from asking a court of competent jurisdiction to issue an injunction[.]").  But the Torrence court made clear that under North Carolina law, "the one-sided quality of an arbitration agreement is not sufficient to find it substantively unconscionable."  Torrence, 753 S.E.2d at 812; see also Hill, 865 F. Supp. 2d at 96 (D.D.C. 2012) ("While the one-sided nature of an arbitration agreement may be relevant to a finding of unconscionability, a court must find additional facts to determine that the agreement is so one-sided as to be unconscionable.").  Accordingly, the agreement is not substantively unconscionable under North Carolina law.

       2. *Procedural Unconscionability*

Because the Court has concluded that the agreement is not substantively unconscionable, it is "not necessary to review procedural unconscionability."  Torrence, 753 S.E.2d at 817.  Nevertheless, the agreement is not procedurally unconscionable, either.  "[P]rocedural unconscionability involves 'bargaining naughtiness' in the form of unfair surprise, lack of meaningful choice, and an inequality of bargaining power."  Tillman, 655 S.E.2d at 370 (quoting Rite Color Co., 411 S.E.2d at 648).

Turner contends that the agreement is procedurally unconscionable because IEM has greater bargaining power than she does, and she had no opportunity to negotiate its terms.  Opp'n at 19.  But "[m]ere inequality of bargaining power, by itself, is insufficient to render an arbitration provision unenforceable."  Pan Am Flight 73 Liaison Grp. v. Dave, 711 F. Supp. 2d 13, 23 (D.D.C. 2010) (citing Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 33 (1991)), aff'd, 639 F.3d 1102 (D.C. Cir. 2011).  Moreover, Turner was provided "as much time as [she needed] to review the material" prior to signing it.  Stewart Decl. ¶ 7.  She points to no facts

10

suggesting that she lacked a "meaningful choice" in whether to sign the employee agreement. Tillman, 655 S.E.2d at 369–70.[4]

## IV. Conclusion

For the foregoing reasons, the Court will grant IEM's Motion to Compel Arbitration and stay the case. See Smith v. Spizzirri, 601 U.S. 472, 478 (2024). A separate Order accompanies this Opinion.

_____
CHRISTOPHER R. COOPER
United States District Judge

Date: July 25, 2025

---

[4] Turner also contends that the American Arbitration Association ("AAA") will "decline to administer" her case because the agreement she signed conflicts with the AAA's due process protocols. Opp'n at 22–23. Given that the AAA has not yet declined to take her case, this argument is premature. Moreover, the portions of the AAA's due process protocols cited by Turner are prefaced with a note that the relevant task force "did not achieve consensus on this difficult issue." AAA Due Process Protocol, ECF No. 12-6, at 1. Some members of the task force were of the view that "[e]mployers should have the right to insist on an agreement to mediate and/or arbitrate statutory disputes as a condition of initial or continued employment." Id. Accordingly, Turner has not shown that the AAA is likely to decline to administer her case because the agreement she signed conflicts with uniformly established protocols.